UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
JET ONE GROUP, INC.

                        Plaintiff,

        -against-                          MEMORANDUM AND DECISION
                                           08-CV-3980 (JS) (ETB)
HALCYON JET HOLDINGS, INC., HALCYON
JETS, INC., ALFRED S. PALAGONIA a/k/a
AL PALAGONIA, MARK HADER, JAN E.
CHASEN AND GREGORY D. COHEN,

                        Defendants.
------------------------------------X

Appearances:
For Plaintiff:      Steven G. Legum, Esq.
                    170 Old Country Road
                    Mineola, New York 11501


For Defendants:     Bruce A. Schoenberg, Esq.
                    Schrader & Schoenberg LLP
                    711 Third Avenue, Suite 1505
                    New York, New York 10017

SEYBERT, District Judge:

        On September 29, 2008, Plaintiff Jet One Group, Inc.
brought suit against Defendants Halcyon Jet Holdings, Inc., Halcyon
Jets, Inc. (collectively, "Halcyon"), Alfred S. Palagonia, Mitchell
Blatt[1], Mark Hader, Jan E. Chasen and Gregory D. Cohen.  The
remaining Defendants have now moved to dismiss Plaintiff's claims,
and for sanctions against Plaintiff's counsel.  For the foregoing
reasons, Defendants' motion to dismiss is GRANTED with leave to
replead the RICO and state law claims, and Defendants' motion for
sanctions is DENIED WITHOUT PREJUDICE.

------------------------

        [1] Plaintiff subsequently dismissed its claims against Blatt.

Plaintiff and Halcyon are both in the same business of brokering private jet flights for clients. Compl. ¶¶ 7, 8. In 2007, then-Halcyon CEO Palagonia, Cohen, and Christian Mattis approached Plaintiff and suggested purchasing all or part of Plaintiff. Compl. ¶ 12. Plaintiff refused to enter into negotiations, allegedly because it was concerned about "Palagonia's reputation and criminal background." Compl. ¶¶ 16-17. Following this refusal, Halcyon recruited Hader, one of Plaintiff's employees, and paid him $50,000 to leave Plaintiff's employ and provide Halcyon with Plaintiff's confidential and proprietary information, including computer records. Comp. ¶ 22.

In May 2008, Halcyon again approached Plaintiff, through Blatt and Cohen. By that time, Blatt was Halcyon's CEO, and Blatt and Cohen informed Plaintiff that Palagonia "was no longer involved in the management of Halcyon." Compl. ¶¶ 24-26. In reliance upon these representations, Plaintiff entered into merger negotiations. Compl. ¶ 28. However, unbeknownst to Plaintiff, "Palagonia was secretly continuing to run and make all final executive decisions on behalf of Halcyon." Compl. ¶ 24.

Negotiations commenced, and the parties eventually negotiated a letter of intent setting forth the terms of a proposed sale of Plaintiff to Halcyon. Compl. ¶ 31. As part of these negotiations, Defendants were given access to Plaintiff's

brokers/sales people and customer lists. Compl. ¶ 43. Defendants,
for their part, covenanted to not solicit any private aviation
business from Plaintiff's clients for a period of one year. Compl.
¶ 44.

Plaintiff contends that Halcyon entered into the merger
negotiations solely as a rouse to enable it to gain access to
Plaintiff's confidential information. Plaintiff claims that
Halcyon never intended to acquire Plaintiff and, in fact, "did not
have sufficient funds nor the access to sufficient funds to
consummate the transaction." Compl. ¶¶ 34, 35. Plaintiff further
alleges that, once given access to Plaintiff's brokers, Halcyon
began recruiting them to leave Plaintiff's employ, informing them
that it would never consummate the merger transaction set forth in
the letter of intent. Compl. ¶¶ 47-50. These brokers then left
Plaintiff's employ to join Halcyon, and took with them Plaintiff's
confidential and proprietary customer lists. Compl. ¶¶ 51-52. In
violation of its non-solicitation agreement, Halcyon then contacted
Plaintiff's customers and advised them that, given Halcyon's
forthcoming merger with Plaintiff, "all future travel should be
booked through Halcyon." Compl. ¶ 53. Thus, "[w]ithin a few weeks
thereafter, plaintiff was left with no brokers and no customers."
Compl. ¶ 55. Having acquired Plaintiff's brokers and customers,
Halcyon then privately informed Plaintiff that it was terminating
the letter of intent, although it made no public announcement to

that effect.  Compl. ¶ 57.  Shortly thereafter, Halcyon terminated Blatt's employment, as it no longer needed a "front man" for Palagonia.  Compl. ¶¶ 59-60.

Aside from this main alleged scheme, Plaintiff also makes a few other scattered allegations.  Plaintiff alleges that Hader "forged a check belonging to plaintiff and converted such funds." Compl. ¶ 23.  Plaintiff alleges that Halcyon interfered with Plaintiff's relationships with a broker and an advertising entity. Compl. ¶¶ 29-30.  And Plaintiff further alleges that Halcyon deceived Plaintiff into sponsoring a polo event by falsely promising to co-sponsor the event, thereby obliging Plaintiff to pay $150,000.  Compl. ¶¶ 37-41.

Plaintiff filed suit, alleging two civil RICO counts (Counts I and II), conversion and theft of proprietary information (Count III), common law fraud (Count IV), tortious interference with its client relationships (Count V), violation of N.Y. Gen. Bus. L. § 349, and a violation of the Computer Fraud and Abuse Act (Count VI).

<u>DISCUSSION</u>

I. <u>Standard of Review Under Rule 12(b)(6)</u>

To withstand a motion to dismiss under Rule 12(b)(6), a complaint must plead facts sufficient "to state a claim for relief that is plausible on its face."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007).  "A

4

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, __ U.S. __, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (reversing the Second Circuit's decision in <u>Iqbal v. Hasty</u>, 490 F.3d 143 (2d Cir. 2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u> Thus, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." <u>Id.</u> (internal citations and quotations omitted). Examining whether a complaint states a plausible claim for relief is "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Id.</u> at 1950. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint fails to state a claim. <u>Id.</u> The plaintiff's factual allegations, in short, must show that the plaintiff's claim is "plausible," not merely "conceivable." <u>Id.</u> at 1951.

In applying the plausibility standard set forth in <u>Twombly</u> and <u>Iqbal</u>, a court "assume[s] the veracity" only of "well-pleaded factual allegations," and draws all reasonable inferences from such allegations in the plaintiff's favor. <u>Id.</u> at 1950.

Pleadings that "are no more than conclusions," however, "are not entitled to the assumption of truth."  <u>Id.</u>

II.  <u>Plaintiff's RICO Claims must be Dismissed</u>

    A.  <u>For now, the Halcyon Entities are Proper Defendants</u>

        As an initial matter, Defendants argue that Plaintiff's RICO claims against Halcyon must be dismissed because the Halcyon entities cannot be both a RICO "enterprise" and defendants.  This argument takes two forms.  First, Defendants argue that Plaintiff's have not properly pled the existence of a RICO enterprise at all, because the individual defendants are all Hacylon directors, officers or employees, and thus are insufficiently "distinct[]" from Hacylon itself.  Second, Defendants contend that – even if Plaintiff does plead the existence of a RICO enterprise, the Halcyon entities are not proper defendants.  For purposes of this motion, each of these arguments is without merit.

        Defendants' first argument depends upon <u>Riverwoods Chappaqua Corp. v. Marine Midland Bank</u>, 30 F.3d 339, 344 (2d Cir. 1994).  But, as Plaintiff's point out, the Supreme Court expressly limited <u>Riverwoods</u> reach in <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001). There, the Supreme Court expressly held that a RICO enterprise exists when a corporate officer or employee "conducts the corporation's affairs in a RICO-forbidden way."  <u>Id.</u> at 163.  In such a circumstance, the corporate officer or employee functions as

6

the "person" controlling the RICO "enterprise." Applying <u>Cedric</u> <u>Kushner</u>, Second Circuit courts have repeatedly recognized that corporate officers and employees are sufficiently distinct from the corporation itself so as to render them RICO "persons," and the corporations they control RICO "enterprises." <u>See</u>, <u>e.g.</u>, <u>City of</u> <u>New York v. Smokes-Spirits.com, Inc.</u>, 541 F.3d 425, 447-449 (2d Cir. 2008); <u>Allstate Ins. Co. v. Rozenberg</u>, 590 F. Supp. 2d 384, 391 (E.D.N.Y. 2008). Here, Plaintiff sufficiently pleads that Hacylon functioned as the "enterprise." Compl. ¶ 62. And Plaintiff also sufficiently pleads that "[e]ach of the defendants" (and, thus, each of the Individual Defendants) were the "persons" who conducted the enterprise through a pattern of racketeering activity. Compl. ¶¶ 61, 70. Thus, Plaintiff's Complaint satisfies RICO's distinctiveness requirement, at least with respect to the Individual Defendants.

It is less clear whether the Hacylon Defendants themselves can be named as RICO defendants. <u>Cedric Kushner</u> reiterated the Supreme Court's previous holding that RICO "depends on showing that the defendants conducted or participated in the conduct of the <u>enterprise's</u> affairs, not just their own affairs." 533 U.S. at 163. In so doing, <u>Cedric Kushner</u> strongly suggests that, although RICO controlling persons face RICO liability, the RICO enterprise itself does not. More recently, however, in <u>Smokes-Spirits.com, Inc.</u>, the Second Circuit held that a plaintiff

7

stated RICO claims against "primary enterprises" consisting of "<u>defendant</u> Smokes-Spirits.com, with defendant Michael Klee as the alleged RICO person,"; "<u>defendant</u> Nexicon, with defendants Richard Urrea, Daniel Urrea, and certain non-defendant individuals as the alleged RICO persons"; "<u>defendant</u> Hemi Group, with defendant Kai Gachupin as the alleged RICO person,"; and "<u>defendant</u> NCCigarettes.com, with defendants XFire, Scott Herring, and Jeff Reinhardt as the alleged RICO persons." 541 F.3d at 448 (emphasis supplied). The Second Circuit did not explain in any detail how or why a RICO enterprise itself can be a RICO defendant and face RICO liability. But it nevertheless expressly held that a plaintiff can assert a RICO claim if it pleads "a <u>defendant</u> corporate entity" as "a passive enterprise with its defendant officer(s) and/or director(s) acting as the RICO 'person[s]' who conduct the affairs of the enterprise." <u>Id.</u> at 435 (emphasis supplied). Thus, at least for purposes of this motion, the Court does not dismiss the Hacylon entities on this ground.

     B.   <u>The Complaint does not Plead a RICO Claim</u>

     Defendants also argue that Plaintiff has failed to plead a RICO claim. This argument prevails.

     To state a RICO claim, a plaintiff must allege "a pattern . . . of racketeering activity." <u>City of New York v. Smokes-Spirits.com, Inc.</u>, 541 F.3d 425, 439 (2d Cir. 2008). A "pattern of racketeering activity" means the commission of "at

least two acts of racketeering activity." 18 U.S.C. § 1961(d).

"Racketeering activity," in turn, means any act falling into one of

several specified categories, from "sports bribery" to "white

slavery" to "biological weapons." 18 U.S.C. § 1961(a). Here,

Plaintiffs state that Defendants acts "includ[ed] mail fraud in

violation of 18 U.S.C. § 1341 and wire fraud in violation of 18

U.S.C. § 1343." Compl. ¶ 69. Because RICO claims must be pled

with specificity and Plaintiff is represented by counsel, the Court

– for purposes of this motion – assumes that Plaintiffs allege <u>only</u>

mail fraud and wire fraud, and will not engage in a <u>sua</u> <u>sponte</u>

fishing expedition to determine what other kinds of predicate acts

the Complaint might allege if construed liberally.

The Complaint does not specifically identify the acts

that it considers to be "mail fraud" or "wire fraud." However, the

Complaint does identify numerous misstatements or other nefarious

acts that Defendants committed. Among other things:

> Halcyon "recruited defendant Hader" and "paid
> him the sum of $50,000.00 to leave plaintiff's
> employ and to provide Halcyon with
> confidential and propriety information,
> including computer records."[2]

---

[2] Because Plaintiff does not allege that any restrictive
covenant prevented Hader from leaving its employ, the fact that
Hader switched employers is irrelevant. Likewise, the allegation
that Hader converted a check belong to Plaintiff (Compl. ¶ 23) –
although fraudulent – does not appear to relate in any way to the
alleged scheme to steal Plaintiff's customers and drive Plaintiff
out of business. Nor is there any allegation that Hader
converted the check on behalf of Hacylon, the alleged RICO
enterprise. Of course, the allegation that Hacylon paid Hader to

Halcyon, "through defendants Blatt and Cohen" falsely represented that "Palagonia was no longer involved in the management of Halcyon," when, in fact, "Palagonia was secretly continuing to run and make all final executive decisions on behalf of Halcyon." Compl. ¶¶ 24-27.

Halcyon signed a letter of intent to acquire Plaintiff even though it had no intention of acquiring Plaintiff and, in fact, "did not have sufficient funds nor the access to sufficient funds to consummate the transaction." Compl. ¶¶ 32-36.

Halcyon, through Blatt, "advised plaintiff that it would join with plaintiff in sponsoring the Bridgehampton Polo event." Compl. ¶ 37. To induce Louis Ottimo and Anthony Ottimo to personally guarantee the sponsorship, Blatt "assured them" that the transaction set forth in the letter of intent "would be closed in the immediate future." Compl. ¶ 40.

Halcyon represented that "if, for any reason, it did not enter into an agreement with plaintiff, it would not, for a period of one year from the letter of intent, solicit any private aviation business from any client of the plaintiff." Compl. ¶ 44.

In some instances, these allegations probably satisfy New York's standard for pleading common law fraud[3] or other torts, and Fed. R. Civ. P. 9's standard for pleading fraud with

_____

steal his employer's confidential information does suffice to plead at least a common law tort.

[3] In New York, common law fraud claims must allege "representation of material fact, falsity, scienter, reliance and injury." <u>Apollo H.V.A.C. Corp. v. Halpern Const., Inc.</u>, 55 A.D.3d 855, 857, 867 N.Y.S.2d 115, 117 (2d Dep't 2008).

particularity.[4]  But none of these allegations suffice to plead
mail or wire fraud for a very simple reason: Plaintiff pleads no
<u>facts</u> tying any of these alleged false statements or fraudulent
acts – or Defendants' scheme as a whole - to the use of the mail or
wires.[5]   Rather, at most, Plaintiff alleges, in a completely
conclusory and non-specific fashion, that the Defendants committed
"mail fraud . . . and wire fraud," without any explanation
regarding <u>how</u> or <u>when</u> Defendants' alleged scheme used the mail or
wires.  Compl. ¶¶ 69, 78.  Thus, Plaintiff has failed to plead any
predicate RICO acts.  And, for that reason, Plaintiff's RICO claims
(Counts I and II) must be dismissed.

    That being said, the failure to allege facts linking the
alleged predicate acts to the mail or wires is probably a curable

_____

    [4] Rule 9 requires a plaintiff to identify (1) the statements
that the plaintiff contends were fraudulent, (2) identify the
speaker, (3) state where and when the statements were made, and
(4) explain why the statements were fraudulent.  <u>See</u> <u>Stevelman v.
Alias Research Inc.</u>, 174 F.3d 79, 84 (2d Cir. 1999).  With
respect to each false statement, a plaintiff must also plead
facts that given rise to a "strong inference" of scienter or
fraudulent intent.  <u>Id.</u>

    [5] To plead a mail fraud claim, a plaintiff must allege: (1)
a scheme to defraud victims of (2) money or property, through the
(3) use of the mails.  <u>See</u> <u>Smokes-Spirits.com, Inc.</u>, 541 F.3d at
445. A claim for wire fraud requires allegations that the
defendant participated "in a fraudulent scheme which was
furthered by the use of interstate transmission facilities."  <u>Id.</u>
at 446 (internal citations and quotations omitted).

defect.  Thus, the Court grants leave to replead the RICO claims.[6]

III. <u>The Computer Fraud and Abuse Act Claims must be Dismissed</u>

Defendants also seek to dismiss Plaintiff's Computer Fraud and Abuse Act ("CFAA") claim, 18 U.S.C. § 1030 <u>et</u> <u>seq</u>.  The CFAA, in relevant part, provides a private federal cause of action against a person who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer."  18 U.S.C. § 1030(a)(2).  Here, the Complaint alleges that, pursuant to his employment with Plaintiff, Defendant Hader "had access to confidential and proprietary information contained in plaintiff's computer system," and that Hader wrongfully "provide[d] Halcyon with confidential and proprietary information, including computer records."  Compl. ¶¶ 20-22.

Defendants argue that Plaintiff has failed to allege any

---

[6] Should Plaintiff decide to file an amended complaint, it is highly recommended that such an amended complaint: (1) identify the specific acts that Plaintiff contends are predicate acts under RICO, and why each specific act so qualifies (<u>i.e.</u>, "X qualifies as a RICO predict act because of Y"); (2) for each alleged fraudulent statement, identify the speaker and why the statement was fraudulent when made – or, if the specific speaker cannot be identified - explain how the statement nevertheless satisfies Rule 9; and (3) for each fraudulent statement or act, identify the facts that Plaintiff contends provide a strong inference of scienter (<u>i.e.</u>, "The following facts provide a strong inference of scienter with respect to this fraudulent statement: A, B, C.").  Although the federal rules arguably do not require such clarity, pleading in this manner will significantly help the Court to identify which of Plaintiff's alleged predicate acts are sufficiently well-pled.

CFAA violation because the CFAA prohibits only unauthorized access, or access that exceeds authorization, and the Complaint indisputably pleads that Hader "had access to confidential and proprietary information" in the ordinary course of business. Plaintiffs respond that, although Hader "was authorized, to an extent, to access Jet One's client list" he "exceed[ed] that authorization" by "taking that client list from their computer for the benefit of the defendant." Pl. Br. at 22. However, Plaintiff's opposition papers do not describe the "extent" to which Hader had access to Jet One's client list, and the Complaint itself places no qualifiers on Hader's access. Rather, it simply pleads that he had "access" to this information. Compl. ¶¶ 20-22. Thus, based on the Complaint's plain language, the Court assumes that by "exceed[ed] that authorization," Plaintiff seeks to assert a CFAA claim based on Hader misusing and misappropriating information that he was freely given access to.

Courts have interpreted the CFAA in different ways. Two Circuits, and at least one Second Circuit district court, agree with Plaintiff that an employee who permissibly accesses his employer's data for an improper purpose, such as misappropriating it, violates the CFAA.[7]  But many other courts have disagreed.[8]

---

[7] See International Airport Centers, L.L.C. v. Citrin, 440 F.3d 418, 420-21 (7th Cir. 2006) (arguing that employee's misappropriation of confidential information violated his duty of loyalty, thereby "terminating his agency relationship . . . and with it his authority to access the laptop"); EF Cultural Travel

These courts reason that the CFAA, by its plain text, prohibits only improper "access[ing]" of computer information. 18 U.S.C. § 1030(a)(2)(c).  Conversely, the CFAA nowhere prohibits <u>misuse</u> or <u>misappropriation</u> of information that is lawfully accessed.  Thus, these courts have held that, to read "access without authorization" or "exceeds authorized access" as prohibiting "misuse" or "misappropriation" would grossly expand the statute's reach.  This Court agrees with the narrower view adopted by these cases, for several reasons.

First, the Supreme Court has instructed courts to interpret a statute based upon its "plain and unambiguous meaning." <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 340-341, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997).  Here, the CFAA prohibits improper

---

<u>BV v. Explorica, Inc.</u>, 274 F.3d 577, 582-84 (1st Cir. 2001); <u>Calyon v. Mizuho Sec. USA, Inc.</u>, 07-CV-2241, 2007 WL 2618658, *1 (S.D.N.Y. 2007).

[8] <u>See</u>, <u>e.g.</u>, <u>American Family Mut. Ins. Co. v. Hollander</u>, 08-CV-1039, 2009 WL 535990, *11 (N.D. Iowa Mar. 3, 2009); <u>Lasco Foods, Inc. v. Hall and Shaw Sales, Marketing & Consulting, LLC</u>, 600 F. Supp. 2d 1045, 1053 (E.D. Mo. 2009); <u>Condux Intern., Inc. v. Haugum</u>, 08-CV-4824, 2008 WL 5244818, *4 (D. Minn. Dec. 18, 2008); <u>Black & Decker (US), Inc. v. Smith</u>, 568 F. Supp. 2d 929, 933 (W.D. Tenn. 2008); <u>Shamrock Foods Co. v. Gast</u>, 535 F. Supp. 2d 962, 964 (D. Ariz. 2008); <u>Diamond Power Int'l, Inc. v. Davidson</u>, 540 F. Supp. 2d 1322, 1341-43 (N.D. Ga. 2007); <u>B & B Microscopes v. Armogida</u>, 532 F. Supp. 2d 744, 758 (W.D. Pa. 2007); <u>Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda</u>, 390 F. Supp. 2d 479, 498-99 (D. Md. 2005); <u>SecureInfo Corp. v. Telos Corp.</u>, 387 F. Supp. 2d 593, 608-10 (E.D. Va. 2005); <u>In re America Online, Inc. Version 5.0 Software Litig.</u>, 168 F. Supp. 2d 1359, 1370-71 (S.D. Fla. 2001).

"access," not "misuse" or "misappropriation."

Second, the statute, read as a whole, strongly indicates that Congress' intent was to prohibit the act of accessing a computer without authorization – not misusing data that one had a lawful right to access. Thus, the statute defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). And the statute further defines "loss" as "reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." § 1030(e)(11). These narrow definitions are wholly consistent with a limited Congressional intent in passing the CFAA – prohibiting people from "hacking" into someone else's computer system, an act which can corrupt "the integrity or availability of data, a program, a system, or information" or lead to "interruption of service." And they are wholly <u>inconsistent</u> with the broader view adopted by the Seventh and First Circuits – because the statute expressly precludes plaintiffs from recovering any "revenue lost" for reasons <u>other than</u> "interruption of service." Simply put: it confounds common sense to suggest that Congress created a private right of action for, essentially, misappropriating confidential information, but expressly denied

15

prospective plaintiffs any relief for this kind of "violation."

Third, the Second Circuit has implicitly adopted the narrow view, albeit in an unpublished decision which interpreted the CFAA's "damage" and "loss" provisions. In <u>Nexans Wires S.A. v. Sark-USA, Inc.</u>, 166 Fed. Appx. 559, 562-563 (2d Cir. 2006), the Second Circuit affirmed a well-reasoned decision by Hon. Miriam Goldman Cederbaum recognizing that – at least with respect to damages – the CFAA says exactly what it means. Specifically, the Second Circuit held that a plaintiff cannot recover "lost revenue" under the CFAA unless that lost revenue derives from an "interruption of service." <u>Id.</u> In so doing, the Second Circuit affirmed Judge Cederbaum's holding that a plaintiff cannot recover revenue lost "as a result of defendants' ability to unfairly compete for business" due to the misappropriated proprietary information. <u>See</u> <u>Nexans Wires S.A. v. Sark-USA, Inc.</u>, 319 F. Supp. 2d 468, 477 (S.D.N.Y. 2004).

Finally, the Court is mindful that, although the CFAA provides for a private right of action, it is primarily a criminal statute. And "penal statutes are construed narrowly to insure that no individual is convicted unless a fair warning (has first been) given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." <u>Mourning v. Family Publications Service, Inc.</u> 411 U.S. 356, 375, 93 S. Ct. 1652, 36 L. Ed. 2d 318 (1973) (internal

16

citations and quotations omitted).  It is simply not appropriate to "expand" the CFAA in a manner not consistent with the statute's plain meaning, and, in so doing, transform what has always been a common law civil tort (*i.e.*, misappropriation of confidential information) into a federal criminal offense.  <u>Cf.</u> <u>U.S. v. Nosal</u>, 08-CR-0237, 2009 WL 981336, *6 (N.D. Cal. 2009) (reasoning that, since some courts have "expanded" the CFAA's meaning in the civil context, there is no reason why criminal prosecutions based on misusing confidential information should be precluded).

Even assuming <u>arguendo</u> that a broad reading of § 1030(c)(2) was appropriate, the Complaint still fails to state a claim.  The CFAA permits a private right of action only to recover "damage or loss," as defined in the statute.  And here, the Complaint does not allege "any impairment to the integrity or availability of data, a program, a system, or information" or any "cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. §§ 1030(e)(8), 1030(e)(11). Rather, Plaintiff alleges only that Defendants obtained "confidential and proprietary information" and used such information to Plaintiff's detriment – while not connecting this detriment to any "impairment" to its computer system, "damage

17

assessment," data restoration expense, or "interruption of service." Compl. ¶¶ 105-108. Thus, even if the CFAA does prohibit common law misappropriation, it does not provide for a private right of action to cure it.

IV.  The Court Declines to Exercise Pendent Jurisdiction over Plaintiff's State Law Claims

Plaintiff's Complaint raises both federal and New York state law claims. Under Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988), a federal court should generally decline to exercise supplemental jurisdiction over state law claims if a case's federal claims are dismissed in the litigation's "early stages and only state-law claims remain." See also 28 U.S.C. § 1367(c)(3). Here, the Court has dismissed all of Plaintiff's federal claims. Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, and dismisses them on this basis. See Carnegie-Mellon University, 484 U.S. at 350. Should Plaintiff replead a viable federal cause of action, Plaintiff may replead these claims as well.

V.  Defendants' Motion for Sanctions is Dismissed Without Prejudice

In addition to moving to dismiss, Defendants have also moved for sanctions against Plaintiff's counsel, Steven Legum. Defendants' motion for sanctions depends upon the following claims:

> (1)  The Complaint alleges that the Defendants originally approached Plaintiff about

18

acquiring Plaintiff in 2007, but that
Plaintiff refused to negotiate because of
Defendant Palagonia's "association" with
Halcyon, due to Palagonia's allegedly bad
reputation and "criminal background."
Compl. ¶¶ 12, 16, 17.

(2)   Plaintiff agreed to the letter of intent
      in reliance upon Defendants' false
      representation that "Palagonia was no
      longer involved in the management of
      Halcyon." Compl. ¶¶ 24, 28, 31, 32.

(3)   Contrary to the Complaint's allegations,
      "plaintiff not only knew that Palagonia
      was still associated with Halcyon,
      plaintiff actually negotiated the Letter
      of Intent with defendant Palagonia."
      Schoenberg Dec. ¶ 5.

(4)   Specifically, Louis Ottimo, one of
      Plaintiff's principals, sent Mitchell
      Blatt, Halcyon's CEO, an email
      referencing his conversations with "Al"
      about a potential acquisition.
      Schoenberg Dec. Ex. A. Defendants claim
      the "Al" referred to in this email was
      Defendant Alfred S. Palagonia.
      Schoenberg Dec. ¶ 5.

(5)   Other employees of Plaintiff negotiated
      directly with Palagonia, such as
      Plaintiff's Long Island Sales Director,
      James Chitty, and documented these
      conversations in emails. Schoenberg Dec.
      ¶ 7 & Ex. B.

(6)   In a July 18, 2008 email, Louis Ottimo
      inquired about setting up a conference
      call with "Al," again, allegedly
      referring to Defendant Alfred S.
      Palagonia. Schoenberg Dec. ¶ 8 & Ex. C.

(7)   A "minimal factual investigation" by Mr.
      Legum would have revealed that there was
      no factual basis for his client's claim
      to have been unaware of Defendant
      Palagonia's continued association with

19

Hacylon.

In his response to Defendants' sanctions motion, Attorney Legum appears to recast certain of the Complaint's allegations using milder language. Thus, whereas the Complaint alleges that Plaintiff refused to do business "with any entity with which Palagonia was associated," Attorney Legum argues that the real objection was that Mr. Palagonia "was the listed CEO." <u>Compare</u> Compl. ¶ 17 to Legum Aff. ¶ 3. And, although Attorney Legum reiterates that Plaintiff only agreed to negotiate with Halcyon after assurances that Palgonia was not involved in Halcyon's "management," (<u>compare</u> Compl. ¶ 24 to Legum Aff. ¶4), Legum ignores the evidence set forth in Defendants' motion for sanctions suggesting (although certainly not proving) that Plaintiff, in fact, knew that Palagonia was still involved in Halcyon's "management."

Attorney Legum is indisputably correct about one thing: the alleged misrepresentations regarding Palagonia's role at Halcyon are not the entirety, or even the core, of Plaintiff's claim. Legum Aff. ¶ 2. But they are "factual contentions" nevertheless, and thus subject to Rule 11's requirement that they "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." FED. R. CIV. P. 11(b)(3). Thus, Rule 11 required Attorney Legum to conduct an inquiry into

them that was "reasonable under the circumstances." FED. R. CIV. P. 11(b).

Here, on behalf of Plaintiff, Attorney Legum indisputably alleged that Plaintiff agreed to negotiate with Halcyon only after assurances that Palagonia was not involved in Halcyon's "management." Compl. ¶¶ 24, 28. Thus, Attorney Legum had a professional responsibility to conduct a reasonable inquiry into whether this allegation was true.

Based on the information before the Court, it is unclear whether Attorney Legum conducted such an inquiry. Attorney Legum's affidavit is completely silent on the inquiry he took to substantiate the allegations made in the Complaint. At the same time, however, Defendants' motion for sanctions cannot succeed unless Defendants establish that: (1) Plaintiff understood that Palagonia was still part of Halcyon's "management" when Plaintiff negotiated the letter of intent, thereby proving the allegations in Compl. ¶¶ 24, 28 to be false; and (2) a reasonable inquiry undertaken by Attorney Legum would have uncovered this falsity; or (3) Attorney Legum knew that Compl. ¶¶ 24, 28's allegations were false, but pled them anyway. At this stage, Defendants have not met this burden.

Indeed, Defendants have not established any of these prongs. Rather, Defendants ask the Court, essentially, to draw inferences upon inferences to hold Attorney Legum liable. First,

it asks the Court to infer that the "Al" referenced in the emails was Alfred S. Palagonia, and that a reasonable inquiry by Attorney Legum would have uncovered this. Second, it asks the Court to infer that – because Plaintiff's senior management negotiated with "Al," both Plaintiff and Attorney Legum must have known that Palagonia remained involved in Halcyon's management. And third, it supposes that a reasonable inquiry required Attorney Legum to review not only the emails of Plaintiff's principals, but also those of its Long Island Sales Director. At this stage, the Court is unwilling to grant any of these inferences.

Thus, at this stage, it is unclear whether: (1) Plaintiff, in fact, understood that Palagonia was still involved in Halcyon's management during the letter of intent negotiations; and (2) Attorney Legum's should have discovered this "fact" prior to filing the Complaint. But, at the same time, with only an incomplete record concerning the veracity of Compl. ¶¶ 24, 28 and without _any_ evidence concerning Attorney Legum's factual investigation prior to filing the Complaint, the Court is unwilling to deny Defendants' motion for sanctions on its merits.

Accordingly: (1) Defendants' motion for sanctions is DENIED without prejudice; (2) Defendants may re-file their motion for sanctions upon the conclusion of discovery concerning what Plaintiff's senior management understood to have been Palagonia's role at Halcyon around the time the letter of intent was negotiated

and/or signed; and (3) should Defendants re-file this sanctions motion, Attorney Legum is directed to prepare a declaration describing the inquiry he took to substantiate the Complaint's factual allegations. To the extent that this declaration discloses work product, Attorney Legum may submit his declaration <u>in</u> <u>camera</u> to the Court.

CONCLUSION

Defendants' motion to dismiss is GRANTED. Plaintiff has leave to replead the RICO and state law claims. Defendants' motion for sanctions is DENIED WITHOUT PREJUDICE.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    Central Islip, New York
          August  14 , 2009